William R. CODY, Appellant,

v.

Herman SOLEM, Warden, South Dakota State Penitentiary; Mark Meierhenry, Attorney General, State of South Dakota, Appellees.

No. 84–1189.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 8, 1984.

Decided Feb. 19, 1985.

Rehearing and Rehearing En Banc Denied March 22, 1985.

David R. Gienapp, Madison, S.D., for appellant.

Jon R. Erickson, Pierre, S.D., for appellees.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

HENLEY, Senior Circuit Judge.

William R. Cody, a South Dakota prisoner convicted of murder, appeals from the district court's[1] denial of his petition for habeas corpus. 28 U.S.C. § 2254. He argues that the court erred in holding that *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), bars all of his claims. On the merits of his petition, he contends that (1) fruits of a search of a Las Vegas hotel room should have been suppressed since his consent to that search was involuntary; (2) he was denied due process by the State's failure to produce certain items of allegedly exculpatory evidence; and (3) the State's use of a bystander juror selection process denied him a fair trial. We hold that Cody is not entitled to habeas relief and affirm.

## I. BACKGROUND.

Edmund Brown was found murdered in his Winner, South Dakota home on the morning of February 10, 1978. Dr. Thomas Henry, a forensics pathologist, testified that Brown died as a result of numerous blows to the head and placed the time of death between 11:15 p.m. C.S.T., February 9, and 3:15 a.m. C.S.T., February 10, 1978.[2]

On February 28, 1978 Cody was arrested in Las Vegas, Nevada on an interstate flight warrant arising out of outstanding embezzlement and larceny charges filed in Pennington County, South Dakota. On the same day Cody was arrested, he was charged with Brown's murder in Tripp County, South Dakota. He was incarcerated and initially interrogated by Las Vegas

---

1. The Honorable Andrew W. Bogue, Chief Judge, United States District Court, District of South Dakota.

2. The victim's body was discovered by his brother, Donald Brown. During the incident Edmund Brown's dog also was killed by blows delivered to the head.

authorities. From about 5:00 p.m. to 9:30 p.m. on February 28, Cody was interrogated in Las Vegas by Marc Tobias, Assistant Attorney General for the State of South Dakota.[3] About a half hour into this interview, Cody refused to sign a consent to search his room at the Aladin Hotel in Las Vegas. Although Cody requested counsel several times during the interrogation, none was provided him until the later stages of the interrogation when he was allowed to telephone South Dakota attorney John Hughes for twenty to twenty-five minutes.[4] Hughes advised Cody to remain silent. Thereafter, Cody signed a consent to search his hotel room. Prior to giving this consent, he was apprised of his rights and the consent form was read to him several times. It was at this time that Cody was allegedly given the so-called "fugitive from justice" speech which will be referred to later in this opinion. Before consent was given, Cody indicated that narcotics might be in the room. After he was assured that no charges would be brought against him with respect to any drugs found in the room, Cody consented to the search.

A subsequent search of the room revealed incriminating evidence which was used against Cody at trial. The authorities found over $53,000.00 in cash hidden behind a metal Kleenex dispenser in the bathroom. The search also uncovered certain receipts from businesses and hotels in Omaha, Nebraska. This allowed the authorities to trace Cody's movements on the days after the murder and ultimately led to the discovery of clothing Cody left behind in Omaha.

Cody was tried by jury, convicted of murder, and sentenced to life imprisonment. The South Dakota Supreme Court reversed his conviction holding that Tobias had violated Cody's *Miranda* rights during the Las Vegas interrogations. *State v. Cody*, 293 N.W.2d 440, 446–49 (S.D.1980) (*Cody I*). The court ruled that all of Cody's incriminating statements should therefore have been suppressed. Nevertheless, the court also concluded that Cody's consent to search his hotel room was voluntary and refused to suppress the evidence found in the room. *Id.* at 451.

Cody was retried and again found guilty of premeditated murder and sentenced to life imprisonment. During the voir dire in the second trial, after the original panel of jurors was exhausted, the trial court directed the deputy sheriff and county coroner to summon bystanders as prospective jurors. One bystander eventually served on Cody's jury.

The state presented essentially the same evidence at both trials. It established that Cody knew Brown and that Cody and a mutual business acquaintance, Marshall Howard, were attempting to persuade Brown to invest money in a hypnotist show Cody and Howard were trying to put together.[5] Cody visited Brown twice in January of 1978, once on January 10 and once on January 27. Cody also spoke to Brown several times on the telephone in the days preceding the murder. There was evidence that Brown was expecting Cody to visit him on February 8 or 9, 1978.

By his own admission, Cody left Rapid City, South Dakota around 11:00 p.m. C.S.T., February 9, 1978, and traveled east on Interstate 90. Although Cody stated that he traveled straight to Sioux Falls, South Dakota, the State's position was that

---

**3.** Cody was also interrogated by Tobias on March 1 and 2, 1978. During the course of these interviews, Cody made certain incriminating statements which were used against him at his first trial. The most damaging statement Cody made occurred when he admitted that he had been present when Brown was killed.

**4.** Cody did communicate briefly with a public defender and a Las Vegas attorney earlier in the day prior to his arraignment on the unlawful

flight warrant. For a more thorough discussion of the facts surrounding the Las Vegas interrogations, see *State v. Cody*, 293 N.W.2d 440, 442–49 (S.D.1980).

**5.** Cody was an entertainer and hypnotist who performed at nightclubs and restaurants. The three also discussed investing money in oil leases.

he stopped at Winner, murdered Brown, and robbed him of a great deal of money.[6]

Cody surfaced in Omaha, Nebraska at approximately 5:00 p.m., February 10, 1978. He checked into the Hilton Hotel under his former name, William Weeks. He paid for the room in cash, and when he asked for a more expensive room than the one he was first shown, he stated that money was no object. Later that evening, he left the Hilton and checked into the Sheraton Hotel using his mother's maiden name, Storie. Maids later found articles of clothing and overshoes left abandoned in the Hilton Hotel room. Canine and Type O blood were found on the clothing. Some of the blood was in a spray pattern.

While in Omaha Cody purchased a wig and new clothing, leaving his old clothing at the clothing store. He paid for the purchases with one hundred dollar bills. He abandoned the pickup truck he had been driving and left Omaha on a chartered plane on the afternoon of February 11, 1978. He also used cash to pay for this flight and told the pilot that he was carrying a large sum of money.

Cody arrived in Las Vegas, Nevada later that evening. There he met a dancer named Angelique Pettyjohn, and for the next seventeen days he gambled, bought drugs, and purchased the services of prostitutes. He changed hotels frequently, registering under several different names, and bought Pettyjohn a Lincoln Continental automobile. Pettyjohn testified that Cody gave her over $6,000.00 in cash to trade in for different bills, or, in Cody's words, he gave her the money to "wash." After washing the money, she returned it to Cody. Later, Pettyjohn, unsure of what she had gotten herself into, contacted Las Vegas authorities and Cody was arrested on February 28, 1978. After Cody's arrest, Pettyjohn turned over to the police five envelopes Cody had given her. The en-velopes contained over $40,000.00 in various denominations.

Brown's fingerprints were found on six of the bills given the police by Pettyjohn and were also found on the envelopes containing the money. Blood was found on both the money in the Las Vegas hotel room and the money given the police by Pettyjohn. Seriological testing showed the blood to be Type O. Brown had Type O blood while Cody had Type A.

Finally, the State presented evidence that Cody was financially desperate at the time of the murder. He was having difficulty raising money for his business ventures, his employees were unpaid, his telephones were about to be disconnected, he was months overdue on his rent, and he had to borrow money from Marshall Howard to pay for his girlfriend's abortion.

Cody's defense centered in part on his allegation that he could not have been in Winner at the time of the murder.[7] He stated that since he was seen in Kadoka, South Dakota about 12:00 a.m. C.S.T. on February 10, the earliest he could have been in Winner would have been 4:45 a.m. C.S.T., over an hour after the latest time Brown could have been killed. As for his possession of the money tied to the victim, Cody stated that this money had been given to him by "investors" in his show while he was in Sioux Falls on February 8, 1978, a Johnny Simon and an individual called "Pete." After receiving the funds, he traveled back to Rapid City where he met two black men in order to consummate a cocaine transaction. An altercation allegedly ensued and Cody stated that he beat up both men, took a large amount of cocaine, and fled the Rapid City area in fear for his life. He stated he traveled straight to Sioux Falls and then to Omaha where he sold the cocaine for $50,000.00 to an individual named Dan Neal. It was also at this time that the aforementioned "Pete" gave him another large sum of cash for invest-

---

**6.** Winner is approximately forty-five miles south of Interstate 90. There was testimony from several witnesses that Brown kept a great deal of cash at his home in Winner and that he collected old large denomination bills as a hobby.

**7.** Cody testified at his first trial but not at his second.

ment purposes. He then proceeded to Las Vegas where he claimed he again met Johnny Simon at Caesar's Palace where further drug transactions were discussed.

After his second trial Cody filed a petition for habeas corpus in federal court on October 10, 1980. This petition was denied for failure to exhaust state remedies. The South Dakota Supreme Court then affirmed Cody's direct appeal. *State v. Cody*, 323 N.W.2d 863 (S.D.1982) (*Cody* II). The court again refused to suppress the fruits of the search of Cody's Las Vegas hotel room, rejected Cody's allegation that the State had destroyed or lost material evidence, and upheld the bystander jury selection process. *Id.* at 866–69.

Cody's second petition for habeas relief was also denied.[8] A third petition resulted in an evidentiary hearing which was held on October 11, 1983. The district court denied relief and this appeal followed.

## II. DISCUSSION.

*Stone v. Powell and the Consent to Search.*

■ In ruling on the present petition, the district court stated:

> Nothing presented at the October 11, 1983 hearing was different in any regard to facts and issues presented to and fully considered by the State trial court and the State Supreme Court. Under *Stone, supra*, it now appears that there was no legal need to again hash over the same matters already fully considered before on the State level.

The district court thus appears to have ruled that all three of the issues raised in the petition were barred by *Stone*.[9] This was error. *Stone* holds that "where the State has provided an opportunity for full

and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted). The bystander juror issue and the issue of whether the State failed to turn over material evidence to the accused under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), both implicate due process, not fourth amendment, questions. As such, they are clearly not barred by the holding of *Stone*. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 320–24, 99 S.Ct. 2781, 2789–2791, 61 L.Ed.2d 560 (1979) (*Stone* is not a bar to due process claim that proof in state trial does not rise to constitutional necessity of proof beyond reasonable doubt). The State conceded as much in oral argument before this court.

■ However, the extent to which *Stone* bars consideration of Cody's claim regarding the search of his Las Vegas hotel room remains to be determined. The search issue was addressed in both of the South Dakota Supreme Court opinions. *See Cody* I, 293 N.W.2d at 449–51; *Cody* II, 323 N.W.2d at 866–67. *Cody* I upheld the voluntariness of the consent. *Cody* II examined the question whether the consent was invalidated by any violation of Cody's right to counsel. The *Cody* II court held that Cody had been given the opportunity to consult counsel prior to the time that consent was given and thus upheld the trial court's refusal to suppress the evidence. The State urges that Cody has been given the opportunity to fully and fairly contest the search and seizure and thus consideration of the issue is barred by *Stone*.

---

8. This petition was denied for Cody's failure to exhaust one of his four claims. Cody moved to amend the petition to waive the unexhausted issue but the district court denied the motion since it was not timely filed.

9. The State argues that the court was merely applying the dictates of *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), which requires federal courts on collateral re-

view of state convictions to give deference to state court fact findings. *See* 28 U.S.C. § 2254(d). *Sumner* is not a complete bar to review as *Stone* is, however, and since the district court apparently believed that all the issues were completely barred, it appears the court was relying on *Stone* rather than *Sumner*. We also note that *Sumner* was nowhere cited in the district court's opinion.

Cody contends that he was not given an opportunity for a full and fair hearing on the consent issue since the state court failed to address the impact of the so-called "fugitive from justice" speech that Tobias gave Cody prior to Cody's consent. Tobias allegedly told Cody that, under Nevada law, a fugitive from justice could not legally occupy a hotel room and that the hotel had the right to evict him and his property. Cody alleges that this constituted a mistaken claim of lawful authority which coerced his consent.

■ We believe that any inquiry into the voluntariness of Cody's consent, the effect of Tobias's alleged speech, and any other of the fourth amendment aspects of this claim is barred by both *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), and *Stone v. Powell, supra.* The *Cody* I court was clearly confronted with the same contention now urged upon this court. The court simply found no record support for the "fugitive from justice" speech and held that, based upon the totality of circumstances, Cody's consent was voluntary. *Cody* I, 293 N.W.2d at 449–51.[10] Cody contends that this was error since the record reflects that Tobias in fact gave the speech. However, Cody has not shown that the state court's fact finding procedure was inadequate to afford him a full and fair hearing, 28 U.S.C. § 2254(d)(2), nor has he shown that this finding, or lack of a finding, is not fairly supported by the record. 28 U.S.C. § 2254(d)(8); *Sumner v. Mata, supra.* Therefore, the state court's assessment of the record is presumed to be correct. Moreover, if Cody's claim is that the court's ultimate conclusions on the voluntariness issue are erroneous, this would still not entitle him to relief. "The *Stone*

bar applies despite a state court's error in deciding the merits of a defendant's fourth amendment claim." *Lenza v. Wyrick,* 665 F.2d 804, 808 (8th Cir.1981); *Holmberg v. Parratt,* 548 F.2d 745, 746 (8th Cir.), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977).

Cody also contends that the consent was invalidated by threshold *Miranda* and sixth amendment violations and that *Stone* does not bar consideration of these issues. While the Supreme Court has not extended *Stone* beyond fourth amendment claims, and even though several courts have refused such an extension, *see, e.g., White v. Finkbeiner,* 687 F.2d 885, 888–94 (7th Cir. 1982) *vacated on other grounds,* —— U.S. ——, 104 S.Ct. 1433, 79 L.Ed.2d 756 (1984); *Hinman v. McCarthy,* 676 F.2d 343, 348–49 (9th Cir.), *cert. denied,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982); *Harryman v. Estelle,* 616 F.2d 870, 872 n. 3 (5th Cir.) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980); *Wilson v. Henderson,* 584 F.2d 1185, 1189 (2d Cir.1978) (dicta), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979), the issue in this case is more aptly categorized as a mixed fourth, fifth and sixth amendment claim rather than purely a fifth or sixth amendment contention. Nevertheless, we need not decide if *Stone* should be extended beyond the fourth amendment context since, even assuming *Stone* is not a bar to these particular issues, Cody is not entitled to habeas relief.

■ Cody argues that the consent was given at a time when no request for consent should have been sought since Cody had been denied the right to counsel under the fifth and sixth amendments.[11] He al-

---

**10.** The court noted that Cody expressly stated that he actually gave the consent because he believed the money was so well hidden that the police would not be able to find it. "Cody, having taken a calculated risk that the money would not be found, cannot now seek to rectify a bad choice by claiming that he was coerced into taking such a gamble." *Cody* I, 293 N.W.2d at 451.

**11.** Cody's right to counsel had attached under both amendments. Cody was subjected to cus-

todial interrogation and therefore had the right to counsel under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (fifth amendment right to counsel arises at custodial interrogation). Cody's sixth amendment right to counsel had attached at the time of the consent since he had been charged with the murder by way of information on February 28, 1978. The sixth amendment gives the accused the right to counsel "at or after the time that judicial proceedings have been initiated ... 'wheth-

leges that his requests for counsel prior to the consent were ignored and that therefore the consent was tainted by the prior police misconduct. *See Cody* I, 293 N.W.2d at 443–49.

▮ It appears that, for sixth amendment purposes, Cody had been given the opportunity to consult counsel prior to the consent. Cody spoke telephonically with attorney John Hughes for some twenty to twenty-five minutes approximately a half hour before signing the consent form.[12] Hughes advised Cody to remain silent, and, through this advice, "impliedly directed Cody to refuse consent." *Cody* II, 323 N.W.2d at 863. This is a state court finding of fact to which we give deference. 28 U.S.C. § 2254(d); *Sumner v. Mata, supra.* In spite of Hughes's advice, Cody nevertheless consented to the search. After speaking with Hughes, Cody did not again request counsel prior to giving the consent. Thus, Cody had the advice and assistance of counsel before consent was given. In the context of the unique circumstances of this case, it is no affront to the sixth amendment to uphold Cody's consent.

▮ Nor can the *Miranda* violations under the fifth amendment support invalidation of the consent. As stated, the South Dakota Supreme Court suppressed the incriminating statements Cody made during the course of the interrogations because the police did not cease questioning after Cody's request for counsel. *Cody* I, 293 N.W.2d at 443–49. Assuming the correctness of this holding, it does not follow that Cody's consent must similarly be suppressed. This is because "the fifth amendment right to counsel is not an independent right; rather, it stems from the privilege against self-incrimination." *Hall v. State,* 705 F.2d 283, 289 n. 4 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983). Simply put, a consent to search is not an incriminating statement.

*Id.; Smith v. Wainright,* 581 F.2d 1149, 1152 (5th Cir.1978); *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977). Cody's consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial. *United States v. Garcia,* 496 F.2d 670, 675 (5th Cir.1974), *cert. denied,* 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 768 (1975); *see also Schmerber v. California,* 384 U.S. 757, 761–64, 86 S.Ct. 1826, 1830–32, 16 L.Ed.2d 908 (1966). Any violation of Cody's fifth amendment rights with regard to the suppressed incriminating statements is thus only relevant to the voluntariness of the consent in view of the totality of the circumstances. *Smith,* 581 F.2d at 1152. As we have already indicated, any inquiry into the voluntariness of the consent is foreclosed by *Stone.*

### The Missing Evidence.

Cody's next contention is that the State's failure to produce certain items of evidence deprived him of due process. He alleges that South Dakota and Las Vegas authorities seized various "personal papers," pages from a "black address book," gasoline receipts for February 9 and 10, 1978, a Rand-McNally Road Atlas, and, most importantly, a number of standard and mini-cassette tapes. These items were allegedly taken from his Rapid City residence prior to his arrest, from his person at the time of arrest, from an automobile purchased by Cody, and from his Las Vegas hotel room after his arrest. He contends that he made a general request for exculpatory material prior to his first trial and specifically requested the above items prior to and during the second trial. He asserts that this evidence was exculpatory and material and that South Dakota authorities either lost or

---

er by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (*quoting Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)).

12. Cody contends that Tobias eavesdropped on this conversation from another phone. While this may or may not be true, it is not determinative of the present issue.

deliberately destroyed the items in question. He seeks dismissal of the indictment as a remedy.

The State responds that it has made available to the defense all evidence in its possession. It denies that much of the above evidence ever existed, and, to the extent it did exist, it does not now have possession of it. The State contends that while it might have inadvertently lost some of the evidence, specifically several tapes made by Cody, this evidence is not material and its loss did not prejudice Cody or deny him a fair trial.

 The suppression of exculpatory evidence by the prosecution violates due process if the evidence is material to either guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *United States v. Key,* 717 F.2d 1206, 1210 (8th Cir.1983) (per curiam). Where evidence in a criminal case has been lost or destroyed, three factors have been analyzed to determine whether an accused's due process rights have been violated: (1) whether the government acted in bad faith; (2) whether the evidence is material to either guilt or punishment; and (3) whether the defendant has been prejudiced by the loss. *United States v. Hoppe,* 645 F.2d 630, 634 (8th Cir.), *cert. denied,* 454 U.S. 849, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981); *United States v. Williams,* 604 F.2d 1102, 1116 (8th Cir.1979); *see also United States v. Miranne,* 688 F.2d 980, 988 (5th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983); *United States v. Picariello,* 568 F.2d 222, 227 (1st Cir.1978); *Armstrong v. Collier,* 536 F.2d 72, 78 (5th Cir.1976); *United*

*States v. Heiden,* 508 F.2d 898, 902 (9th Cir.1974); *United States v. Bryant,* 439 F.2d 642, 651 (D.C.Cir.1971). This inquiry involves an "assessment of the government's culpability for the loss, together with a realistic appraisal of its significance ..., its bearing upon critical issues in the case and the strength of the government's untainted proof." *United States v. Doty,* 714 F.2d 761, 764 (8th Cir.1983) (*quoting United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir.1980)). "[C]riminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made." *Bryant,* 439 F.2d at 651.

 There is little to suggest that the government acted in bad faith in either destroying or losing the evidence. Cody makes only conclusory allegations of impropriety. With regard to what appears to be the most important items of missing evidence, the cassette tapes made by Cody, he accuses former Assistant Attorney General Tobias of either deliberately destroying the tapes or at least negligence in losing them.[13] It does appear that at least some of the tapes existed. Yet the record is totally unclear as to how many actually existed and, of those that existed, how many had anything recorded on them. At least one tape was transcribed and turned over to the defense. Detective Santongue of the Las Vegas Police Department testified that he listened to several tapes and that only one or two of them had anything on them. He stated that these two tapes contained an inventory of what Cody was

---

**13.** Cody points to Tobias's "foul deeds" in violating Cody's constitutional rights during the Las Vegas interrogations. It is true that Tobias did not fully respect Cody's requests for counsel and his behavior during the interviews was certainly less than exemplary. However, many investigative officers have been guilty of similar conduct in the past and undoubtedly some will violate the *Miranda* rights of defendants in the future. In their zeal for ferreting out evidence of a crime, officers sometimes stretch the Constitution. When they do, their conduct should be condemned. But we do not believe that the fact

that Tobias may have violated Cody's *Miranda* rights justifies the inference that he also purposely destroyed exculpatory evidence.

Cody also makes reference to the fact that a videotape recording of the murder scene, which was taken by Tobias soon after the killing, was lost and later found in Tobias's residence after he had left the State's employ. While Tobias's actions with regard to the videotape are disturbing, it appears to have been an isolated instance. No pattern of such behavior has been alleged or proven.

spending at the different casinos in Las Vegas and was a verbal record of Cody's expenses. With regard to the material other than the tapes, the State denies that it ever existed and that it ever had possession of any such evidence.

The only thing that is certain about the tapes and the other alleged evidence is that the State no longer has possession of it. The State has no explanation of what happened to the tapes except to say that they were inadvertently lost sometime prior to the first trial. While we are hesitant to simply accept the State at its word, we are also unwilling to infer that the State acted in bad faith on the basis of what has been presented. It does appear that South Dakota authorities have made conscientious efforts to locate the evidence but have been unable to do so. The State rechecked with Las Vegas authorities to make sure that no evidence was still remaining in Nevada. Attorney General Meierhenry has stated in open court that the State has been forthright from the beginning in giving the defense all exculpatory materials. While we certainly do not condone the loss of the evidence, we do not believe a finding of bad faith is warranted.

With regard to the second and third factors, the materiality of the evidence and the degree of prejudice resulting to the accused from its loss, Cody asserts that the evidence was vital to his defense. He contends that he was a "fanatic" recordkeeper who kept detailed notes on everything he did. He argues that the tapes and other evidence would corroborate his fight with the two black men in Rapid City and his story that he left South Dakota in fear for his life rather than in flight after Brown's murder. He alleges the evidence would also corroborate the fact that he was not in Winner on the night of the murder and would verify his meetings with Dan Neal, "Pete" and Johnny Simon, and show how he came into possession of the stolen money.

Evidence that has been specifically requested from the government is material if it "might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The South Dakota Supreme Court held that the missing evidence, if produced, would not have altered the jury's verdict. *Cody* II, 323 N.W.2d at 868. After carefully balancing the possible effect of the missing evidence with the strength of the government's case at trial, we agree with the state court's assessment.

We acknowledge that it is difficult to gauge the materiality of the evidence since, in cases such as this, we obviously cannot examine the items in question.[14] Indeed, we do not even know how much of it ever existed. As stated, from Detective Santongue's testimony, we do know that one or two of the tapes contained an inventory of what Cody spent and won in gambling in Las Vegas. Other than this marginal knowledge, we have only Cody's bald assertions as to what the evidence would have shown. In this regard, we believe it is significant that Cody never mentioned the tapes or other evidence in his testimony at the first trial or at the original suppression hearing.

Nevertheless, even accepting the fact that to some extent the evidence might bolster Cody's version of his movements and activities during the relevant time frame, we do not believe this negates the strength of the State's case or that it could have changed the jury's verdict. By his own admission, Cody passed within forty-five miles of Winner on the night of the murder. The evidence is clear that he knew the victim, and, indeed, he was expected by Edmund Brown on February 8 or 9, 1978. It is difficult to believe that any of the allegedly missing evidence could conclusively demonstrate that Cody could not have been in Winner at the time of the murder.

14. "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents is unknown and, very often, disputed." *California v. Trombetta,* —— U.S. ——, ——, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984).

Furthermore, Cody's movements after the murder are basically undisputed. He checked into two different hotels in Omaha, Nebraska under aliases, left clothing which was tied to the victim through seriological analysis, and was in possession of a great deal of money. This is a person who, on February 9, 1978, had to borrow money to pay for his girlfriend's abortion and who, according to the clear weight of the evidence, was in a great deal of financial difficulty. The missing evidence also could not negate the fact that, after leaving Omaha, he traveled to Las Vegas where he spent a large amount of money and where, using aliases, he checked in and out of various hotels in what would appear to be an attempt to conceal his whereabouts. Finally, the money which was given by Cody to Angelique Pettyjohn and the money which was found in his Las Vegas hotel room were directly tied to the murder victim through both seriological and fingerprint analyses. It is conceivable that, if Cody is believed, the tapes could show his meetings with "Pete," Neal and Simon which, in turn, could possibly corroborate Cody's story that he received the money from them. The fact remains that neither Pettyjohn nor his other companions while in Las Vegas, Carole Rife and Melinda Meagher, ever saw him meet with any individual named Simon, and he produced no other witnesses who could support his alleged contact with any of these men. Moreover, Cody never mentioned the existence of the men to State investigators after he was arrested and could not produce any of the three to testify at either of his trials. In the absence of even a scintilla of independent evidence which would tend to show that these men exist, we are unwilling to speculate that the missing tapes would show that Cody received the stolen cash from these individuals.

In sum, we believe that the State's untainted proof, while circumstantial, overwhelmingly established Cody's guilt. We are convinced that the missing evidence, if it had been produced, would not have changed the ultimate verdict of the jury. Its loss, therefore, did not deprive Cody of a fair trial and we refuse to impose the harsh sanction of dismissal of the indictment.

*The Bystander Juror.*

In Cody's second trial, after twelve jurors had been tentatively selected, the State indicated that it would exercise its last peremptory challenge. Since this would exhaust the regular jury panel, the court, pursuant to South Dakota statute,[15] directed Tripp County Deputy Sheriff Wilcox and the Tripp County Coroner to summon additional jurors. The first three bystanders were excused for cause. The next juror, a Mr. Fast Horse, was not a bystander but had been summoned for the regular panel and had arrived late. Fast Horse was passed for cause and Cody waived his last peremptory challenge. Two alternates remained to be chosen. The next bystander to arrive was William Phillips, the manager of a local department store. He was passed for cause and took his place as an alternate. After several potential alternate jurors were dismissed for cause, it came to the court's attention that juror Fast Horse had lied during his voir dire.[16] The court ruled that the State could therefore reopen its examination of Fast Horse and that Cody would be given the opportunity to withdraw his last peremptory challenge. Before reexamination of Fast Horse began, two more bystanders, a retired State engineer and his successor, were passed for cause. The next morning, the State successfully challenged Fast Horse for cause.

**15.** The trial court utilized S.D.C.L. § 16–13–42 (1979), which provided that upon exhaustion of the original jury panel the court could order the sheriff, deputy sheriff or coroner to summon residents of the county as jurors. This statute has been amended so as to eliminate the participation of the above individuals. *See* S.D.C.L. § 16–13–42 (Supp.1984). Under the new statute, if the original jury panel becomes exhaust-ed, the clerk of court places additional names on the master jury list using random selection procedures. *Id.*

**16.** Fast Horse had indicated that he had never been a defendant in a trial when in fact he had several prior criminal convictions.

This moved juror Phillips into position to become the twelfth juror unless Cody exercised his last peremptory challenge. Cody waived this last challenge and juror Phillips served on Cody's jury. The two State engineers served as alternate jurors.

Cody contends that this method of selecting bystander jurors violated his due process rights and that *Anderson v. Frey*, 715 F.2d 1304 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 739, 79 L.Ed.2d 198 (1984), requires reversal. He argues that the sheriff was a witness for the State at trial, both the sheriff and his deputy had been active in the investigation of the Brown murder, and that both had been named as defendants in a civil rights suit filed by Cody. Therefore, he asserts that officials actively involved in the crime's investigation participated in the selection of the jury.

The State responds that Cody waived his objection to the manner of jury selection by failing to exercise his last peremptory challenge with respect to juror Phillips. It contends that, in order to complain about the selection of a particular juror, Cody must have challenged the juror for cause, been denied, and must have exhausted all of his peremptory challenges. *See State v. Means*, 268 N.W.2d 802, 813 (S.D.1978) (defendant waives objection to specific jurors by not exhausting all peremptory challenges). It argues that since Cody has not shown the requisite cause and prejudice for his failure to comply with the State procedural rule, he is now barred from raising the issue in federal court under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ There are several reasons why *Sykes* does not bar Cody's claim. First, even had Cody exercised his last peremptory challenge and removed Phillips, Phillips would have been replaced by another bystander, one of the two engineers. Thus Cody had no way to avoid having a bystander juror serve on his jury. Second,

Cody did object to the method of selecting bystander jurors as soon as the court announced its intention to utilize the procedure. Finally, and most importantly, the South Dakota Supreme Court reached the merits of Cody's bystander claim. *Cody* II, 323 N.W.2d at 868–69. Apparently the state court believed that Cody preserved his objection to the use of bystander jurors. The alleged procedural default appears to have been ignored. "[I]t is now well accepted that when the state appellate court ignores the state procedural default, the federal courts may also reach the merits on a habeas review. To do so does not denigrate the state procedural system." *Walker v. Engle*, 703 F.2d 959, 966 (6th Cir.) (collecting cases), *cert. denied*, —— U.S. ——, 104 S.Ct. 396, 78 L.Ed.2d 338 (1983); *Hensen v. Wyrick*, 634 F.2d 1080, 1081 (8th Cir.1980). *Wainwright v. Sykes, supra*, is thus no bar to our review of Cody's contentions.

■ Proceeding to the merits of Cody's claim, we have vacated several convictions based on the use of bystander juror selection procedures. *Anderson v. Frey*, 715 F.2d 1304 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 739, 79 L.Ed.2d 198 (1984);[17] *Thompson v. White*, 661 F.2d 103 (8th Cir.1981), *vacated*, 456 U.S. 941, 102 S.Ct. 2003, 72 L.Ed.2d 463 (1982), *opinion after remand*, 680 F.2d 1173 (8th Cir.1982), *cert. denied*, 459 U.S. 1177, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983); *Henson v. Wyrick*, 634 F.2d 1080 (8th Cir.1980). *Cf. Russell v. Wyrick*, 736 F.2d 462 (8th Cir.1984) (no due process violation where a different sheriff's office investigated case); *Holt v. Wyrick*, 649 F.2d 543 (8th Cir.1981) (same), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). Where an interested official participates in the selection of the jury in a criminal trial, an accused's due process rights may have been violated. *Anderson*, 715 F.2d at 1309.

The dangers from sheriff selection of jurors are several. The sheriff may

---

**17.** The State contends that *Anderson* should not be retroactively applied to Cody's conviction. We need not address this issue since, even as-

suming the applicability of *Anderson*, Cody is still not entitled to relief.

choose jurors whom he believes are likely to vote in favor of the prosecution. The likelihood of this is heightened if the sheriff or his deputies investigated the case or if the sheriff chooses only people he knows. Another danger is the chance that a juror so selected may associate the credibility of the sheriff with that of any deputy who testifies at the trial.

*Russell*, 736 F.2d at 463.

■■■ Indeed, "[p]rejudice to the defendant can be presumed when the sheriff or his agents select bystander jurors with whom they are acquainted for cases which they have investigated." *Id.* at 464.

■■■ Since Deputy Wilcox participated in both the investigation of the crime and the selection of some of the jurors, Cody makes a strong argument for reversal. Nevertheless, we do not believe Cody should prevail on his claim since it does not appear that juror Phillips was selected by Deputy Wilcox or anyone actively involved in the murder investigation. Instead, it appears that Phillips was chosen by the coroner. Transcript of Criminal Jury Trial Proceedings at 365.[18]

The coroner's office was only tangentially involved in the investigation of the case, if it was involved at all. While the coroner may have gone to the scene of the crime initially, Dr. Thomas Henry was immediately called in and did the actual investigation of the scene. Moreover, while the body was taken to a funeral home with which the coroner was associated, the autopsy was performed by Dr. Henry. After a painstaking search of the record, we cannot discern how the coroner was involved in the investigation of the case. His minimal role, considered in a constitutional context, simply does not rise to the level of active investigation. Thus, just as in *Russell* and *Holt*, the person who actually chose the bystander was not involved in the case's

investigation and consequently was not an interested official.

In addition, there is nothing to suggest that the coroner has the type of "institutional interest" in the outcome of trial that a law enforcement officer has.[19] *See Anderson*, 715 F.2d at 1308–09. Moreover, institutional interest alone is not enough to deprive a defendant of a fair trial. *Russell*, 736 F.2d at 464.

While the potential for unfairness was certainly present at Cody's trial, "we are unable to conclude that this potential manifested itself...." *Russell*, 736 F.2d at 464. It appearing that juror Phillips, the only bystander to serve on the jury that convicted Cody, was not selected by "an interested official or his or her subordinates or professional associates," we reject Cody's argument that he is entitled to a new trial because of the use of a bystander juror selection process. *Anderson*, 715 F.2d at 1309.

### III. CONCLUSION.

While we agree with Cody that not all of his contentions are barred by *Stone v. Powell, supra*, we nevertheless reject the merits of his petition. We refuse to suppress the fruits of the search of his Las Vegas hotel room and reject his plea for dismissal of the indictment based on any loss of evidence by the State. In addition, we refuse to overturn his conviction because of the bystander juror selection process. None of the alleged errors deprived Cody of a fair trial. He has twice been convicted of the murder of Edmund Brown. His second conviction may be allowed to stand.

Affirmed.

---

18. When Phillips was asked who had asked him to come and serve as a juror, he stated that, although he did not know what the person's name was, the person was not a deputy sheriff. By inference, this would indicate that it was the coroner who chose Phillips.

19. This is not to say that a coroner could never have an interest in the outcome of a trial. Were the coroner actively involved in the investigation, a different case might well be presented.