**Thomas SIMMONS, Petitioner,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Respondent.**

**No. PB–C–83–411.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Dec. 31, 1985.

Ron Heller, Little Rock, Ark., for petitioner.

Jack Gillean, Ass't Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### FACTS

Thomas Simmons, a thirty-seven-year-old white male was convicted of four counts of capital murder and sentenced to death for killing four persons in 1981. The facts are related in detail in the opinion of the Supreme Court of Arkansas, 278 Ark. 305, 645 S.W.2d 680 (1983) and will only be briefly reviewed at this time.

Jawana and Larry Price agreed to handle the sale of a used car owned by Mrs. Price's employer, Holly Gentry. On Monday morning, January 5, 1981, Mrs. Price admitted a man into the Price's apartment who professed interest in the car and when she left for work, Larry Price and the man were having coffee in the kitchen. Mr. Price failed to keep a lunch date with his wife and when she discovered he had not reported for work, she went to the police station accompanied by Gentry to report her husband missing. After talking with police officers, Mrs. Price and Gentry left to return to the Price's apartment and a policeman, Tate, went in a blue, unmarked police car to meet them there.

A short time later, a neighbor saw a man make three trips from the apartment complex to the blue car. On the first trip, he accompanied a man whose hands were bound behind him. Then he brought out another man whose hands were tied and finally he brought out a woman. He drove away with the three individuals in the car.

The bodies of Mrs. Price, Tate, and Gentry were discovered by a farmer on Tuesday, and Mr. Price's body was found in a different place on Wednesday. Various witnesses placed Simmons at the Price's apartment complex, in the areas where the cars were later found, and at the parking lot where Mrs. Price parked her car. Other events occurred which implicated Simmons and led to his arrest and ultimately his conviction and sentence to death.

### LEGAL PROCEEDINGS

On January 8, 1981 Simmons was charged by information with four counts of capital murder. Charges were filed in both Sebastian and Crawford Counties. On April 17, 1981 Simmons' attorney moved for a change of venue contending extensive publicity concerning the crimes, the identity of the defendant, and pre-trial motions filed on defendant's behalf had created prejudice in the minds of the inhabitants of Sebastian and Crawford counties such that it would be impossible for the defendant to receive a fair and impartial trial in either county. Defendant asked that the trial be transferred to a county other than Sebastian and Crawford. A hearing was held on May 11, 1981 to consider this matter and other pre-trial motions; the motion for change of venue was denied.

At the bifurcated trial which began on August 5, 1981, the jury found Simmons guilty on all four counts and sentenced the petitioner to death by electrocution on each count. Counsel for the defendant moved

for a mistrial which was denied and judgment was entered in accordance with the jury verdict.

Petitioner appealed his conviction to the Arkansas Supreme Court which affirmed the conviction and the sentence. *Simmons v. State,* 278 Ark. 305, 645 S.W.2d 680 (1983) *reh'g denied,* (March 14, 1983). The United States Supreme Court declined to grant certiorari on October 3, 1983. Execution was scheduled for November 11, 1983, and on November 4, Simmons petitioned the Arkansas Supreme Court for a stay of execution and for additional time to request post-conviction relief pursuant to Arkansas Criminal Procedure Rule 37. The petition was denied on November 7, 1983.

On November 8, 1983 Simmons requested a stay of execution pending a federal habeas proceeding pursuant to 28 U.S.C. § 2254. This Court granted a stay until further order.

In his amended habeas petition, petitioner raises seven grounds for relief. He requested a hearing on one issue, whether his Sixth, Eighth and Fourteenth Amendment rights were violated when the trial court refused to grant a mistrial after it was discovered at trial that the identity of the individual who provided the police with information which led to the discovery of the body of Larry Price had been withheld from defendant. A hearing before this Court was held on September 3, 1985 at which evidence was presented on this issue. Petitioner and the State rely on arguments presented in briefs on the remaining six points and we will address each in turn.

## POINTS RELIED ON

### I.

Simmons was deprived of his right to a fair trial when the trial court refused to grant the motion for a change of venue.

In his first point, petitioner claims that pre-trial publicity was so prejudicial that it was impossible for him to receive a fair trial in the 12th judicial district consisting of Crawford and Sebastian Counties. (The trial was held in Crawford County.)

The federal habeas statute provides that factual findings made by a state court are entitled to a presumption of correctness unless one of seven enumerated conditions is found to exist or unless the court's determination is not "fairly supported by the record." This presumption may be overcome only by "convincing evidence that the factual determination by the state court was erroneous." 28 U.S.C. 2254(d).

The United States Supreme Court held in *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) that the effect of pre-trial publicity on a jury is a factual issue. Therefore, the refusal of the trial court to order the venue changed is presumptively correct. The petitioner has failed to produce any evidence which convinces this Court that the ruling was erroneous.

The pre-trial publicity dispersed by the media consisted of newspaper accounts and radio and television broadcasts which occurred, for the most part, within the first week following the murders. These were primarily brief factual accounts of the events and many did not refer to the defendant in any manner. Defendant was arrested before the bodies of the four victims were discovered and most of the publicity focused on the search for the bodies. The relatively few items which appeared after January concerned defendant's return from a psychiatric examination, pre-trial motions, and hearings on those motions.

Voir dire of individual jurors took place seven months after the murders and the arrest of defendant, and the transcript reveals that only six of about sixty prospective jurors were excused because of their feelings about defendant's guilt. Each juror who was seated was pronounced "good for the defense" by Simmons' attorney. All had heard or read something about the case soon after the crimes were committed but a finding of impartiality does not require that each juror be ignorant of the facts involved in the case. *Irvin v. Dowd,*

366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "The relevant question is not whether the community remembered the case, but whether the jurors at ... trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, supra, 104 S.Ct. at 2891 (citing *Irvin v. Dowd* ). Each juror stated he had no opinion as to the guilt or innocence of defendant and each stated he would follow the judge's instructions.

The pre-trial publicity evidenced in the record was not so inflammatory that a wave of public passion against the defendant existed so as to prejudice his right to a fair trial. The motion for change of venue was correctly denied.

## II

The fact that the capital murder statute and the statute dealing with murder in the first degree have overlapping provisions deprives petitioner of due process.

Simmons claims in his second point that the overlapping of offenses in the capital murder statute, Ark.Stat.Ann. § 41–1501(1)(a) (1977), and the statute regarding murder in the first degree, Ark.Stat.Ann. § 41–1502(1)(a) (1977), renders those statutes unconstitutionally vague and therefore deprives him of due process. He maintains the overlapping permits arbitrariness in a jury's decision.

The relevant portion of Ark.Stat.Ann. § 41–1501(1)(a) defines capital murder as murder committed in the course of one of seven felonies under "circumstances manifesting extreme indifference to the value of human life." Ark.Stat.Ann. § 41–1502(1)(a) is phrased in the same terms but applies to a murder committed during the course of any felony. Capital murder is punishable by death or life imprisonment without parole while murder in the first degree is punishable by a sentence of imprisonment and/or a fine.

The Supreme Court of Arkansas has repeatedly upheld the constitutionality of these two statutes. *See, e.g. Ford v. State*, 276 Ark. 98, 633 S.W.2d 3 (1982); *Wilson v. State*, 271 Ark. 682, 611 S.W.2d 739 (1981); *Cromwell v. State*, 269 Ark. 104, 598 S.W.2d 733 (1980). *See, also Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (statute is not rendered unconstitutional by jury's option to convict defendant of a lesser included offense). The United States Supreme Court, when faced with a challenge to the constitutionality of two state statutes which prohibited convicted felons from receiving firearms and provided for different penalties, upheld the statutes as constitutional. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). The court noted that a "criminal statute is invalid if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Id.* at 123, 99 S.Ct. at 2203 (citations omitted). The court has stated that "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–598, 9 L.Ed.2d 561 (1963).

Both statutes under attack here clearly identify the conduct prohibited and unambiguously describe the applicable penalties thus providing adequate notice. Petitioner's argument is without merit.

## III

Simmons' Sixth, Eighth and Fourteenth Amendment rights were violated when the court refused to excuse prospective jurors Watkins, Moore, and Billingsly for cause.

Petitioner next takes issue with the court's refusal to excuse for cause three individual jurors who, he contends, revealed bias toward him during voir dire. Simmons exercised three of his twelve peremptory challenges to eliminate those individuals from the jury.

The Supreme Court has stated that a trial judge's finding that an individual venireman was not biased and therefore was properly seated is a finding of fact subject

to the presumption of correctness of § 2254(d). *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). This holding recognizes that the trial judge is in the position to assess the credibility and demeanor of potential jurors and that his determination concerning partiality is based on his observations as well as on answers to questions during voir dire. *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Because of the factual nature of the issue of a particular venireman's bias, the question becomes whether fair support exists in the record for the state court's conclusion that the jurors would be impartial. 28 U.S.C. § 2254(d)(8).

█ The voir dire of Buelah Watkins appears at pages 1654–1688 of the trial transcript, and a review of her testimony reveals absolutely no prejudice against the defendant. She heard factual accounts concerning the crime at some time before on television or radio but had heard nothing recently. She had no opinion about how the case should be decided and she testified she would follow the court's instructions. She stated and reiterated she would have to hear the evidence before deciding the guilt or innocence of defendant and before determining the appropriate penalty in the event defendant was found guilty. The impartiality of this juror is supported by the record.

The testimony of Mildred Moore appears at pages 1897–1918. She testified she would have to hear both sides of the case before deciding whether a guilty defendant should get the death penalty. She heard factual accounts about the crimes and the defendant on television and read accounts in the newspapers. She knew nothing about defendant or his background and she had no opinion on his guilt. She professed belief that a man is innocent until proven guilty and acknowledged she would follow the judge's instructions and set aside what she had read or heard and listen to the evidence with an open mind.

Calvin Billingsly's voir dire appears in the record at pages 2589–2616. He had read newspaper accounts and perhaps heard television reports of the case. His wife worked at Citizens Bank and she told him about transactions at the bank concerning the petitioner. He stated, however, that the fact his wife worked at the bank would not influence his actions as a juror. He professed his belief that Simmons was innocent until proved guilty and stated he would consider both possible sentences—life without parole and death if Simmons were adjudged guilty. He said he would follow the court's instructions and would have to hear all the evidence before deciding the case.

Of considerable importance is the fact that none of the three jurors served on Simmons' jury. Petitioner exercised his final strike just before the 12th juror was seated and each venireman who was seated was pronounced "good for the defense."

"An impartial jury consists of jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The trial judge's determination that these three individuals were impartial is fairly supported by the record and petitioner is not entitled to relief based on this ground.

### IV

Petitioner's rights under the Sixth, Eighth, and Fourteenth amendments were violated when the court refused to grant his motion for a mistrial following disclosure during the course of trial that the identity of the individual whose phone call led to the discovery of the body of Larry Price had been withheld from petitioner's counsel.

It is undisputed that Deputy Bill Grill received a phone call on the evening of January 7th during which he was advised that either a mannequin or a body had been seen at Clear Creek Recreation Area. The officer followed up on the tip and discovered the body of Larry Price.

Deputy Grill told the defendant's attorney as well as the prosecutor that the call was from an anonymous source and it was

during his testimony at trial that he revealed for the first time that the caller was Lon Maxwell who had asked to remain anonymous. Lon Maxwell did not actually see the object. The observer was his brother, Clyde Maxwell. Defendant's counsel asked for a mistrial contending the withholding of this information impaired the petitioner's ability to prepare for trial and investigate the crime. His motion was denied.

Deputy Grill's testimony relevant to this issue appears in the record of trial at the pages noted.

A. When I arrived at the scene was shortly before 9:00 P.M. (R. 3590).

Q. Was anyone with you?

A. Yes.

Q. Who was with you?

A. The man who called me.

Q. Who was that?

A. Lon Maxwell.

Q. Mr. Grill, it has been previously reported that this telephone call was anonymous. (R. 3591).

A. Yes.

Q. You are familiar with that?

A. Yes, sir.

Q. In fact, I believe on at least two occasions I inquired as to who it was that called you and you told me you did not know for sure and would not even tell me if you did know; is that correct?

A. I believe I told you I would not tell you because the man asked at that time to remain anonymous.

A. The man was present the night I went to Clear Creek Park. He was somewhat intoxicated and at that time he did not say anything. I was told that there was either a body down there or a mannequin. (R. 3600).

Q. Who told you that?

A. Lon Maxwell. He wasn't sure that it was even a body.

Q. Did Clyde tell you—Did Clyde tell you anything about where the body was supposed to be? (R. 3603).

A. Clyde didn't say much. He was—he was some intoxicated. He didn't say anything about, other than he was, he was saying, "Mannequin or body, but I don't know." I think he was repeating Lon.

Q. Did it appear that Clyde had, that Clyde actually had personal knowledge of where the body was or had actually seen it?

A. It didn't appear that way to me, no, sir.

Q. Did you ever ask him whether he had seen it? (R. 3604).

A. No, sir. Mr. Maxwell told me he hadn't seen it, Lon Maxwell.

Q. Well, did you ask either of them how they came to suspicion that the body might be at that particular location?

A. I did, and he said he was just told that someone saw it that was down in the park drinking some beer.

Q. Who told him that?

A. Who told who what? I didn't understand you.

Q. Okay, Mr. Grill, let me explain. As I understand it, you were investigating four murders and I thought I— Did you not consider it important to know how, who discovered that body, how it was discovered?

A. Yes, sir.

Q. How they gained knowledge of it being there, whether they had participated in it in any way?

A. Yes, I did, but I was a hundred percent sure to myself Lon Maxwell wasn't involved in it.

Q. Were you not curious as to who might be involved in it, curious enough to ask who told you this so you could go—

A. Yes, I did ask him, and he said a guy saw it down there while they was drinking beer. Then he has later told me it was his brother and he

didn't want to get involved with the press coming around and so forth.

An evidentiary hearing was held before this Court for the purpose of hearing testimony on this single issue. Mr. Garner Taylor testified he was a deputy Public Defender for Sebastian County and along with John Settle, the Public Defender, represented petitioner at trial. He stated the Sebastian County Prosecuting Attorney has an open file policy which permits defense attorneys access to the prosecutor's file and presumably to all written police reports. The policy was applied in Simmons' case.

Taylor testified the media reported that the tip which led to the discovery of Larry Price's body was an anonymous one. Deputy Grill told him on one occasion that the caller was anonymous and "he wouldn't tell me even if he did know who it was." Taylor indicated he first knew the identity of the caller when Grill testified at trial. He said he didn't move for a continuance because he doubted it would have been granted and he didn't think a continuance would have helped at that point. He stated he did not file a motion asking the court to order Grill to reveal the identity. Taylor also stated he was shocked to learn Grill had been accompanied by Lon Maxwell and an unidentified person when he discovered the body since the media and police reports indicated Grill was alone at the time.

Ron Fields, prosecutor for the 12th judicial district, testified to the open file policy of the office and stated defendant's counsel filed a discovery request asking the prosecutor to secure any material any police agency had concerning the case even if irrelevant. Fields asked all investigating agencies to give him this information and he provided it to Simmons' attorney.

Prosecuting Attorney Fields testified that Grill also told *him* he didn't know who had made the call. Fields stated:

> We had several meetings. We had, like I say, we had a number of agencies investigating the case. We had several, I guess you would say 'skull sessions' where we all got together to make certain that everybody knew exactly what each agency was doing. I recall Chief of Police of Fort Smith, Henry Oliver, specifically asked Deputy Grill, I specifically asked Deputy Grill in the meeting, and I also followed Deputy Grill down after the meeting and caught him on the stairwell and told him that if he knew, and it was one of those case[s] where the witness wanted to remain anonymous, that assuming that there wasn't any evidence that, you know, that we could deem appropriate thing under Rule 509, to protect his identity; Detective Grill stated that he did not know the name.

> John Settle came to me on at least one occasion, I think twice; Mr. Settle and I had a very good working relationship; we do not 'snow' one another; if he asks me a question, I tell him the truth, if I ask him a question he tells me the truth, or we don't say anything if it's something that we don't want him to know, if it's strategy; but, be that as it may, if we give an answer we do not mislead one another.

> He asked me if I knew who the person was, I stated that I did not. He asked if Bill Grill had indicated to me that he knew who it was, and I said he had not.

> And that was the state of it up until the trial. Now, I do not recall exactly when I learned that Bill Grill was prepared to give the name of the witness. As I recall, my recollection was that Mr. Taylor told me in a very heated conversation outside in the hallway, told me that Deputy Grill had just told him that he was—that he was going to say who it was, and he was asking me if I knew it, and I said, 'I am stunned.' And I was.

> Looking through the transcript it may be that I was aware of it when he asked the question, but, be that as it may, either Mr. Taylor himself told me, or I found out about it in the court-

room at the same time Mr. Taylor knew it; I did not know it beforehand.

Q. So it was as big a surprise to you at that point as it was to the defendant?

A. If not a bigger surprise, yes, sir. (Transcript of hearing held Sept. 3, 1985, 27–29.)

Concerning a continuance, Fields testified:

[I] indicated that if they wanted a continuance that I would use whatever resources were at hand to locate this person and have him in the courtroom. I was aware that the State was going to put on some substantial rebuttal witnesses. By that I mean fairly lengthy; and we had been in the trial for a week and a half or so; we were under no time burden at all; as far as I was concerned the trial could have gone a month; we weren't trying to rush it, we were trying to do a very thorough job. I don't know—I think in this case we had already had a couple of delays like this to obtain witnesses where the State went out and—I think in one case we tried to obtain Mr. Simmons' sister a couple of times, and I don't know if that was on—I think it was going to be a defense witness, but it may have been our witness, but we had gotten a couple of delays for that and used the State's resources. But, apparently, at that time they did not want the continuance. (T. 29–30.)

Then at page 33 he said:

[A]fter the trial I asked Detective (sic) Grill to go into this more, that I wanted to know what had happened. His report back to me reflected that I, I— you're saying the word "Clyde," and I don't remember—I have never seen—

Q. The brothers.

A. Two brothers. Okay. And that he had been down there with one other person at Clear Creek Park, which is a Corps of Engineers Park in a very isolated area of Crawford County; that he had been drinking in the car along with the other guy and that the Maxwell brother, Clyde, had gone to this drainage ditch, or slough, and while he was standing there, apparently there was moonlight, or something, and he saw what he reported to be either a mannequin or a body; he thought it was a body; he became very frightened; he immediately turned around, got in the car, and he and the other person left the area. To my knowledge, the other person never got out of the car. And they drove and talked to, I guess, Lon Maxwell, who called Grill. At that point, they thought, 'Well, it was dark and maybe it's a mannequin,' so that's how the mannequin-thing got started. They hadn't actually examined the body that closely to see if it was a human or not. (T. 33–34.)

■ Petitioner alleges the late disclosure of the identity of the caller precluded him from preparing properly for trial. However, he fails to disclose how the identity of the caller would have been used if it had been known before trial. He states in his brief that "the presentation of the defense may have been enormously changed." And the public defender who represented him at trial stated at the September hearing "we might have decided to use [the Maxwells) as witnesses." This sort of speculation is insufficient to establish a constitutional violation. *Richards v. Solem*, 693 F.2d 760 (8th Cir.1982).

■ Although the prosecution has a constitutional duty to disclose exculpatory evidence, *United States v. Turner*, 725 F.2d 1154 (8th Cir.1984), this information is not exculpatory. The identity of the caller cannot be said to be favorable to the defendant nor does it create a reasonable doubt as to petitioner's guilt that otherwise did not exist. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Counsel for petitioner admittedly could have asked the Court in a pre-trial motion to require Grill to disclose the identity of the caller if it was known to Grill. And he could have requested a continuance at the time the disclosure was made.

## V.

Simmons' rights under the Fourth Amendment were violated by the trial judge's refusal to suppress statements made by defendant and real evidence taken from defendant at his residence.

At a suppression hearing prior to trial, petitioner tried to convince the trial court that his arrest was illegal and that all evidence obtained thereafter was the "fruit of the poisonous tree" and should be suppressed. Alternatively petitioner claims his consent to search was not valid since it was not shown by the state that it was given freely and voluntarily. Petitioner also attacks the validity of search warrants issued by the trial court. The judge at the trial court upheld the arrest and the search warrants and allowed the evidence to be used.

The Supreme Court of Arkansas reviewed the trial court's decision and found it was not clearly erroneous and that furthermore, no prejudice to defendant had been shown. *Simmons v. State*, 278 Ark. 305, 645 S.W.2d 680 (1983).

■ It is well-settled law that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). It follows that federal courts have jurisdiction of such an issue only when the petitioner was denied an opportunity to fully and fairly litigate his Fourth Amendment claim "at trial and on direct review." *Id.* at 495 n. 37, 96 S.Ct. at 3052 n. 37. The Eighth Circuit Court of Appeals has applied this rule of law to the consent to search issue where a state court had ruled consent was valid. *See Cody v. Solem*, 755 F.2d 1323 (8th Cir.1985).

■ Simmons not only had the opportunity to litigate these claims in state court but did in fact actually try these issues.

Therefore, this Court is precluded from relitigating them.

## VI.

Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the court refused to declare a mistrial during the penalty stage when the jury did not follow instructions of the trial court concerning consideration of aggravating circumstances.

After the jury returned its verdict, the forms were reviewed by defendant and his counsel in the presence of the court, the jury, and other counsel. It was noted that on each verdict Form No. 2, except that dealing with the charge concerning the death of Larry Price, it was stated that one or more of the jurors found "fear of detection" as a mitigating circumstance. Defendant's counsel requested a mistrial arguing that the forms showed the jury failed to understand the court's instructions. The court denied the motion and at the request of defense counsel, polled the jury.

■ Defendant's argument that the jury has added an additional aggravating circumstance to those specified by Ark.Stat. Ann. § 41–1303 is totally without merit and a misstatement of the facts. As is obvious from the verdict forms which appear at pages 274–301 of the transcript, some member(s) of the jury found an additional *mitigating* circumstance. Ark.Stat.Ann. § 41–1302 requires a jury to consider any mitigating circumstances and defendant has failed to show any constitutional error in its action.

## VII.

Petitioner's conviction was supported by sufficient evidence.

Petitioner claims the evidence presented at trial was insufficient to support a conviction.

■ A claim of insufficient evidence by a habeas petitioner can succeed "only if no

rational trier of fact could find the petitioner guilty beyond a reasonable doubt." *Richards v. Solem,* 693 F.2d 760, 767 (8th Cir.1982) citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ The evidence of Simmons' guilt included: identification by witnesses who saw him at the Price's apartment and in the company of at least three of the victims shortly before their deaths; Simmons' presence at relevant times in the areas where two cars owned by the victims were found; testimony by a witness who saw an occupant of a car owned by Simmons watching victim's car for over one hour; tracing of the murder weapon to a neighbor of petitioner; physical evidence (hair, semen) found on bodies of victims consistent with petitioner's identity; petitioner's involvement and identification regarding the forged check written on the closed account of two of the victims.

This evidence is sufficient to support the conviction.

### CONCLUSION

After a thorough consideration of the record of pre-trial hearings, the trial in state court, and the evidentiary hearing before this Court, it is determined that defendant has not been deprived of any constitutional right. He has been ably represented throughout the proceedings by appointed counsel who receive the appreciation of the Court. However, the petition must be denied.