# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 19, 2013

## STATE OF TENNESSEE v. MARVIN WENDELL KELLEY

**Appeal from the Circuit Court for Maury County**
**Nos. 19686, 19959      Robert Holloway, Judge**

**No. M2011-02260-CCA-R3-CD   Filed October 29, 2013**

The Defendant, Marvin Wendell Kelley, appeals from his jury convictions for first-degree murder, a Class A felony; felony murder in the perpetration of a robbery, a Class A felony; and aggravated robbery, a Class B felony. In this appeal, he contends as follows: (1) that his indictment should have been dismissed due to lost evidence; (2) that the admission of his co-defendant's statements were hearsay and violated his right to confrontation; (3) that statements from a witness were improperly admitted over a hearsay objection; (4) that the trial court erred in denying his suppression motion; and (5) that the evidence was insufficient to support his convictions. After a thorough examination of the record and the applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Marvin Wendell Kelley.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; T. Michel Bottoms, District Attorney General; Brent A. Cooper and Kimberly L. Fields Cooper, Assistant District Attorneys General; for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The instant case arose out of the March 6, 2010 assault, and subsequent death, of Harold Wayne Clemens (the victim). The Defendant was arrested, pursuant to a stop of a car in which he was a passenger, and subsequently indicted for first-degree premeditated murder,

felony murder, and aggravated robbery.[1] The Defendant and his co-defendant filed a motion to suppress evidence found as a result of the felony stop, and a joint suppression hearing was held.

## *I. Suppression Hearing*

The suppression hearing was held on September 2, 2010. At the hearing, the Defendant requested suppression of all evidence seized during the search of a car belonging to his co-defendant, Christopher Hooten, in which he was a passenger. The Defendant argued that co-defendant Hooten's statement, "I'm done[,]" should have been considered "lawyering up" and that any questioning after co-defendant Hooten invoked his right to counsel was improper. The Defendant also argued that "no exigent circumstances or probable cause existed to search the vehicle and [that] all evidence found as a result of the stop should be suppressed." The prosecution argued that the Defendant lacked standing to challenge the search and, alternatively, that co-defendant Hooten's statement was not a "clear articulation" of his rights and that the subsequent consent he gave officers to search the car was lawful.

The testimony from the suppression hearing established that Officers Alex McPherson and Steve Ellis stopped the Defendant and co-defendant Hooten because their car, a maroon Cadillac, matched the description of a car driven by suspects in an assault. The officers handcuffed both men, read them their Miranda rights, and placed each in separate patrol cars. Officer Ellis began questioning co-defendant Hooten, but when Officer McPherson approached the patrol car, co-defendant Hooten stated that he was "done talking." The officers then waited on the detective assigned to the case to arrive. Later, during a conversation with Detective James Reed, co-defendant Hooten consented to a search of the car on the condition that he could stand next to Det. Reed and observe the search. During the search, officers found a bloody shoe in the trunk of the car. Upon the shoe's discovery, co-defendant Hooten stated his desire to speak with a lawyer. The search was then terminated, and both men were transported to Detective Reed's office.

On September 9, 2010, after hearing the evidence, the parties' arguments, and reviewing documents filed in support of those arguments, the trial court issued a written order overruling the Defendant's motion to suppress, holding that co-defendant Hooten's statements were not a "clear articulation" of his invocation to his right to remain silent nor

---

[1] The Defendant was initially indicted for first degree felony murder and aggravated robbery on April 21, 2010, but he was indicted for the additional charge, premeditated first degree murder, on July 21, 2010.

his right to counsel.[2] The court further found that co-defendant Hooten had voluntarily consented to the search of his vehicle that resulted in the discovery of incriminating evidence, and as such, the discovery of the shoe was not fruit of an unlawful search. The court went on to explain that, despite its specific findings of a lawful search, even if the search had been unlawful, the doctrine of "inevitable discovery" would apply as the discovery of the shoe was inevitable incident to the arrest of co-defendant Hooten and the Defendant.

## II. Trial

The Defendant's trial was held September 6 through 8, 2011, and the following evidence was presented: Robert Reed found the victim shortly before midnight in the parking lot of a bar, the Wayside Inn. Mr. Reed had left the bar to take a nap in a friend's motor home, located directly behind the bar, when he heard a commotion outside. Upon opening the door of the motor home, Mr. Reed saw the victim lying on the ground in the parking lot a few feet away from the motor home; the victim was bleeding from his ears and nose. Mr. Reed heard the victim gurgling, and he knew the victim was in "bad shape." Mr. Reed reported that he saw two men walking away from the scene, one a larger man and the other a smaller man, toward a maroon or burgundy, early 1990s model Cadillac. However, he could not make out any distinguishing features because the men were too far away. The men were gone when he returned to the scene after calling 911.

On March 6, 2010, shortly before midnight, Officer McPherson of the Columbia Police Department (CPD) was on patrol when he received a radio dispatch for all officers to be on the lookout (BOLO) for a "maroon square body style Cadillac, occupied by two white males." Officer McPherson proceeded to search the surrounding area when he met up with Officer Ellis, who stated that he previously had contact with a man who owned a car matching the description from the BOLO. Officer Ellis also stated that he knew the man's name, "Chris Hooten," and where he lived, an address on Bandiwood Drive. Officers Ellis and McPherson then drove to Bandiwood Drive in an attempt to locate the car matching that description.

Just as the officers were about to leave the area, Officer Ellis identified a square-body-styled Cadillac driving towards him and turning onto Bandiwood Drive. The car then pulled into a driveway on Bandiwood Drive, at which time both officers parked behind the Cadillac and activated their blue lights. Officer Ellis radioed that he had stopped a car, occupied by two white males, matching the description of the BOLO; the two men were later identified as Christopher Hooten and the Defendant.

---

[2] At some point before trial commenced, the defendants' cases were severed.

Officers Ellis and McPherson ordered both men to exit the car with their hands up, and the men were handcuffed and placed in the back of separate squad cars. They were both read their Miranda rights at that time. Officer Ellis, who knew co-defendant Hooten from a previous encounter, began conversing with him. Officer Ellis testified that co-defendant Hooten kept asking him what was going on. Officer Ellis said that co-defendant Hooten denied any involvement, and towards the end of their conversation, asked if the victim was dead. Shortly thereafter, Officer McPherson leaned into the car and laid his microphone near co-defendant Hooten, at which point Hooten stated, "No sir. I'm done talking to you."[3] The officers explained that after conducting a cursory search of the car from the outside, they then held the defendants until a detective could come to the scene because it was CPD policy to call a detective to the scene to speak with the suspects when a stop was based on a case in which a detective was involved.

Approximately an hour after the stop was initiated, Detective James Reed arrived, and the scene was turned over to him. Det. Reed approached co-defendant Hooten, whom he had known for over twenty-two years; confirmed that he understood the Miranda rights as previously explained by the officers; and requested consent to search co-defendant Hooten's car. Hooten responded, "If you'll let me get out and stand beside it, I'll let you search it." Officers on the scene then proceeded to search the car as Det. Reed and co-defendant Hooten observed. During the course of the search, the trunk of the car was opened and both officers saw a tennis shoe covered in what appeared to be blood. When Det. Reed was notified of the discovery, he asked co-defendant Hooten about the bloody shoe. Co-defendant Hooten then stated, "How about this, how about I invoke my rights[.]" At this point, the search of the vehicle and questioning of co-defendant Hooten ceased. The shoe was then photographed, collected, and later forwarded to the Tennessee Bureau of Investigation (TBI) for DNA testing. After the shoe was discovered, both co-defendant Hooten and the Defendant were then placed under arrest and transported to the detective's office for questioning. There, the Defendant was again informed of his Miranda rights and signed a waiver form prior to giving a statement that he later reduced to writing.

Det. Reed presented the video recorded statement given by the Defendant and read his written statement into evidence at trial. In his statement, the Defendant claimed that he and co-defendant Hooten had been at the Rebel Bar and Grill where they met the victim.

---

[3] According to the officers' testimony, Officer Ellis's car, in which co-defendant Hooten was a passenger, was not equipped with a video or sound recording. Officer McPherson's car was equipped with video and sound, and he had a microphone on his person that was connected to the recording equipment. Apparently, Officer McPherson was attempting to put his personal microphone in Officer Ellis's car to record Officer Ellis's conversation with co-defendant Hooten when Hooten saw it and stated that he was "done talking."

They then left to "get some dope[,]" and the victim provided co-defendant Hooten with twenty dollars for that purpose. After visiting three locations, the Defendant claimed they were unsuccessful in finding drugs, at which point the victim became angry, believing the other two had ripped him off. The Defendant claimed that the victim wanted to fight him, so co-defendant Hooten pulled over behind the Wayside Inn. He said that the victim got out of the car and was instantly "on [him]." The Defendant insisted that he felt threatened and that he only "hit and kicked [the victim] one time a piece in self defense." The Defendant further claimed that he and co-defendant Hooten left immediately after the fight and went to Hooten's uncle's house where Hooten went inside, and he sat in the car, for approximately thirty minutes. After leaving there, they returned to the Defendant's mother's home on Bandiwood.

After the Defendant's arrest, among the items recovered from him was a Motorola Trac Phone that Det. Reed initially believed belonged to the Defendant. However, the investigation revealed that the phone actually belonged to Sandra Ragsdale, the victim's landlord, and that she had allowed the victim to borrow her phone on the night of his death.

Later, the car was towed to a police impound lot, and after a warrant was obtained, it was searched and held for approximately a year. There was conflicting testimony presented regarding the functionality of the passenger-side door of the car. Officer McPherson testified that the passenger-side door would not open from the inside or outside, and the Defendant had to exit the car from the driver-side door. However, Detective Mark Craig testified that eleven days after the car had been impounded, he was asked to check the passenger-side door, and it could be opened from either the inside or the outside. When defense counsel went to examine the functionality of the passenger-side door on September 2, 2011, eight days before the trial began, the car had already been released to co-defendant Hooten's mother at his request.[4]

TBI Special Agent Charles Hardy, qualified as an expert in serology and DNA, conducted a DNA analysis of both the bloody shoe discovered in the trunk of the car at the scene and the shoe's mate found during the subsequent search of the car. He compared the DNA recovered on these items to that of the Defendant, co-defendant Hooten, and the victim. The analysis revealed that the blood on the outside of both shoes matched the victim, and the DNA on the inside of the shoe recovered on the scene was definitively that of the Defendant, excluding co-defendant Hooten as a contributor. However, the inside of the other shoe did not contain sufficient DNA to exclude the Defendant, co-defendant Hooten, or the victim as contributors.

---

[4] Det. Reed testified that it is their policy to release the car to the owner once it has been processed.

April Drew, the victim's ex-wife, testified that on March 7, 2010, she was notified that the victim had been taken to Vanderbilt Hospital, and she informed the victim's father, James Clemens. Mr. Clemens testified that Ms. Drew told him that "someone had robbed [the victim]" and that the two of them went to the hospital immediately. Upon their arrival, doctors informed Mr. Clemens that the victim was unable to survive without life support and requested his permission to remove the victim from life support. Mr. Clemens then granted permission to terminate life support, and the victim passed away shortly thereafter.

Dr. Adele Lewis, the medical examiner who performed an autopsy on the victim, testified that an external examination of the victim revealed that he had two black eyes; blood in the nostrils and ears; and multiple bruises on the following areas of his body: head, arms, leg, and a rather large bruise on his back. Dr. Lewis further testified that the victim's injuries suggested that he had been hit or kicked "at least six times." An internal examination revealed that the victim also had a fracture at the base of his skull. Dr. Lewis explained that the cause of death was "multiple blunt force injuries to the head," resulting in a fractured skull, and that the manner of death was homicide. On cross-examination, Dr. Lewis admitted that the victim's black eyes could have been caused by the skull fracture and that, because the victim's bruises cannot be dated with medical certainty, the head injuries and the skull fracture could have been caused by the "one hit and one kick" that the Defendant claimed he inflicted on the victim.

Michael Morgan was serving time in the Maury County Jail with the Defendant, and over the course of approximately five weeks, the two men conversed. Mr. Morgan testified that the Defendant relayed that he and his cousin had been drinking and abusing pills at "the Rebel" when they met the victim. The three men decided to attempt to find some crack cocaine, and the victim agreed to provide $100 with the Defendant and co-defendant Hooten contributing $20. Mr. Morgan then testified that, before leaving the bar, co-defendant Hooten and the Defendant decided to rob the victim after obtaining the drugs. Mr. Morgan further testified that after purchasing the crack cocaine, they used some of it, and the three began to argue as to how the rest would be divided:

> I know they had stopped and they had smoked. And I guess when they got done smoking, the victim had – of course, he had more than what [the Defendant] and his cousin had, them having no more money or whatnot. They got out of the car, and [the Defendant] had struck the victim and a – and a fight broke out. I don't know exactly what happened from that stage there, but I guess they took his – took the rest of the drugs, apparently.

Mr. Morgan stated that after the fight, the Defendant was walking back to the car when co-defendant Hooten informed him that the victim was still moving. Mr. Morgan

testified,

> [The Defendant] started to go back to the car, the cousin was in the car and
> they had – he was laughing or something and then, the cousin had said
> something to [the Defendant] about kicking him in the face, because the guy
> was still moving. And [the Defendant] went back and --- and --- and kicked
> him.

On September 8, 2011, a jury found the Defendant guilty as indicted. The
prosecution did not file a notice of intent to seek enhanced punishment, so the court
sentenced the Defendant to life on the two first degree murder convictions and merged the
first-degree premeditated murder conviction into the felony murder conviction. On the
aggravated robbery conviction, the parties agreed to a sentence of ten years, to be served
concurrently with the life sentence, for an effective sentence of life.

This timely appeal followed.


ANALYSIS

On appeal, the Defendant contends (1) that the trial court erred in denying his
suppression motion; (2) that the trial court improperly admitted his co-defendant's statements
because they were hearsay and violated his right to confrontation; (3) that statements made
by James Clemens were improperly admitted over a hearsay objection; (4) that his indictment
should have been dismissed due to lost evidence; and (5) that the evidence was insufficient
to support his convictions. The State responds (1) that because the Defendant was a
passenger in the car, which was the subject of the suppression motion, he lacked standing to
challenge the search and, alternatively, that the trial court properly found that consent was
given to search the car; (2) that the issue involving the admission of co-defendant Hooten's
statements is waived and, alternatively, that the issue is without merit because the statements
were not offered for their truth; (3) that the statements made by James Clemens were not
offered for their truth but to show the effect on the witness; (4) that the State did not infringe
or impede the Defendant's ability to present a defense by releasing the evidence at issue; and
(5) that the evidence was sufficient to support the Defendant's convictions.[5]

### I. Denial of Suppression Motion

The Defendant contends that the trial court erred in denying his motion to suppress

---

[5] We have reordered the issues as presented in the Defendant's brief.

evidence from the search of the car because both defendants were under duress when consent was given: they were handcuffed, placed in patrol cars, and told they were not leaving for a while and that a reasonable person would not have felt free to leave.[6] The State responds that the Defendant does not have standing to contest the search of the car and, alternatively, that consent to search the car was lawfully obtained.

*A. Standing*

As a preliminary matter, we address the Defendant's argument that the State never raised the issue of standing previously. The record reflects that the State did, in fact, argue that the Defendant lacked standing to challenge the search of the car at the suppression hearing. Although the trial court did not address the issue in its order denying the Defendant's motion to suppress, the issue was raised in the trial court, and we will consider it on appeal.

When determining whether a defendant has standing to contest a search,

> the crucial question is "whether the challenged search and seizure violated the Fourth Amendment Rights of a criminal defendant who seeks to exclude the evidence obtained during [the challenged search]." That inquiry requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

State v. Turnbill, 640 S.W.2d 40, 45 (Tenn. Crim. App. 1982)(citing Rakas v. Illinois, 439 U.S. 128, 140 (1978)).

To determine what impact that infringement had to a specific defendant's Fourth Amendment rights, we make two inquiries: (1) "whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy, and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." State v. Ross, 49 S.W.3d. 833, 840 (Tenn. 2001) (citing Katz v. United States, 389 U.S. 347, (1967)). This court has recognized several factors that should be considered for purposes of assisting in the constitutional inquiry:

> (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the

---

[6] Given that the Defendant is not challenging the stop of the car nor his subsequent detention, we need not determine whether probable cause existed to extend the initial investigatory stop.

defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

Turnbill, 640 S.W.2d at 46; see also State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991); State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990).

It is fundamental that one challenging the reasonableness of a search or seizure has the burden of establishing a legitimate expectation of privacy in the place or property which is searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Rakas, 439 U.S. at 148. Typically, a passenger in a car does not have an expectation of privacy in the trunk of a car. Rakas, 439 U.S. at 148-49. Here, the evidence does not suggest that he had any reasonable expectation of privacy in the trunk of co-defendant Hooten's car. The Defendant did not have a property interest in his co-defendant's car; he did not have a possessory interest in the car or trunk; he could not exclude others from the trunk of the car; he displayed no subjective expectation that the trunk would remain free from governmental invasion; and he did not take any precautions to protect his privacy, e.g. covering the shoe with another item or placing it inside a bag. See Turnbill, 640 S.W.2d 40, 46; see also State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982); State v. Cothran, 115 S.W.3d 513, 521 (Tenn. Crim. App. 2003). As such, the Defendant does not have standing to contest the search of co-defendant Hooten's car. Nevertheless, because the trial court passed upon this issue and denied suppression based upon co-defendant Hooten's consent to search the car, we will also analyze the consent issue.

*B. Consent*

The Defendant contends that the consent given by co-defendant Hooten was coerced. In his brief, the Defendant urges this court to "look at the consent of Mr. Hooten as it would relate to Mr. Kelley" and notes, "[i]t was only after continued pushing" that co-defendant Hooten gave consent for the car's search. The State responds that the trial court properly concluded that co-defendant Hooten gave the officers conditional consent to search the car and only revoked that consent after incriminating evidence was found.

First, we address the Defendant's argument that co-defendant Hooten's consent was coerced because it resulted from "continued pushing" and find that it is without merit. The trial court determined that co-defendant Hooten's statement, "I'm done[,]" made when he was conversing with Officer Ellis, was not a clear invocation of his right to silence or counsel. Nothing in the record preponderates against that finding.

-9-

Generally, "[a] consent to a search is not the type of incriminating statement toward which the fifth amendment is directed [because i]t is not in itself 'evidence of a testimonial or communicative nature.'" United States v. Lemon, 550 F.2d 467, 472 (9th Cir. 1977) (quoting Schmerber v. California, 384 U.S. 757, 761 (1966)). Therefore, while "the Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel [or his right to remain silent], . . . there is no similar prohibition on securing a voluntary consent to search for physical evidence." United States v. Knight, 58 F.3d 393, 397 (8th Cir. 1995) (citing Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir. 1985)); see also State v. Steven Bernard Sydnor, No. M2007-02393-CCA-R3-CD, 2010 WL 366670, at *13 (Tenn. Crim. App. Feb. 2, 2010). This is because a consent to search, in and of itself, is not evidence which tends incriminate. Cody, 755 F.2d at 1330. Although, a search pursuant to consent may disclose incriminating evidence, that "evidence is real and physical, not testimonial." Id. Therefore, even if co-defendant Hooten had previously invoked his right to silence, it was not improper for the officer to request consent to search the car.

Given the above conclusion, the only remaining inquiry is the voluntariness of co-defendant Hooten's consent to search. "To pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Simpson, 968 S.W.2d 776, 784 (citing State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)).

The record reveals that co-defendant Hooten was read his Miranda rights at least twice, one time was immediately prior to granting a conditional consent to search the car provided he could observe the search.[7] That condition was granted, and the search commenced; it was only after incriminating evidence was found that co-defendant Hooten invoked his right to counsel, and the search was terminated. From that point forward, co-defendant Hooten continuously invoked his right to remain silent and refused to answer any additional questions. This suggests that co-defendant Hooten understood his Miranda rights. Thus, when he gave his consent to search the car, it follows that he did so knowingly and intelligently; there is no evidence to support an alternate finding. See State v. Smith, 834 S.W.2d 915, 921-22 (Tenn. 1992). Therefore, the denial of suppression was proper because co-defendant Hooten consented to the search that led to the discovery of the Defendant's bloody shoe. Accordingly, the Defendant is not entitled to relief on this issue.

---

[7] He also signed a written waiver of his Miranda rights.

## II. Failure to Preserve Evidence

The Defendant in this case contends that the State had a duty to hold the car and failed in that duty when they allowed it to be released before the defense was able to conduct an independent examination of the car; thus, his indictment should have been dismissed. The State responds that it neither infringed upon nor impeded the Defendant's right to present a defense by releasing co-defendant Hooten's car over a year after the incident. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Additionally, the State has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the guilt of the defendant. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d 912, 916 (2010), our state supreme court adopted a test to determine whether the loss or destruction of evidence deprived a defendant of a fair trial. The State's duty to preserve evidence is limited to constitutionally material evidence described as "evidence that might be expected to play a significant role in the suspect's defense." Ferguson, 2 S.W.3d at 917-18 (quoting California v. Trombetta, 467 U.S. 479, 488 (1984)). To meet this materiality standard, the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. State v. Merriman, --- S.W.3d ---, 2013 WL 4399040, at *4 (Tenn. 2013)(citing Ferguson, 2 S.W.3d at 915, 918).

In support of his argument that the State failed to preserve evidence, the Defendant posits as follows:

> In this case, the District Attorney's office released the car in question. No fault can be placed on the defendant[,] and the District Attorney's office was involved from the very beginning. The lost evidence had high probative value. It was the defendant's statement that he had acted in self defense. The defense of self defense was extremely hampered by the testimony allowed that the door, in fact, was in working condition. Clearly, the defendant's statement set forth a self defense claim. Clearly, the State had a duty to protect and hold the automobile, as the same may prove to be exculpatory.

The record in this case reveals that at the time the vehicle was released, the State had

no duty to continue to preserve the automobile. To survive the initial step of the Ferguson analysis, the destroyed evidence must both (1) possess a "potential" exculpatory value that existed prior to the destruction of the evidence and (2) be of such a nature that the Defendant would be unable to obtain comparable evidence by other reasonably available means. Ferguson, 2 S.W.3d at 917; Merriman, 2013 WL 4399040 at *4. Here, the car in question did not possess the requisite apparent exculpatory value prior to its release from State's custody. First, there were conflicting statements as to whether, as the Defendant contends, the passenger door was inoperable on the night of the incident. Second, the Defendant does not even explain the relevance of the operability of the front passenger door and how it would support his claim of self-defense, and our review of the record reveals no such nexus between the self-defense claim and the door's operation. Further, we note that despite having no duty to do so, the State maintained the car for approximately a year, during which time the Defendant had access to and was able to obtain the evidence at issue. Therefore, the Defendant is not entitled to relief on this issue.

### III. Improper Admission of Statements: Hearsay and Confrontation

The Defendant contends that statements made by the victim's father, James Clemens, were inadmissible hearsay and, as such, improperly admitted at trial. He also contends that statements made by co-defendant Hooten were improperly admitted because they were hearsay and deprived him of the ability to cross-examine co-defendant Hooten about those statements. The State responds that none of the statements at issue were admitted for the truth of the matter asserted and that the trial court properly admitted them.

Generally, the admissibility of evidence rests within the sound discretion of the trial court, and this court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id. However, the determination of "[w]hether the admission of hearsay[8] statements violated

---

[8] See generally State v. Flood, 219 S.W.3d 307, 313 (Tenn. 2007)(quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001), superseded by statute on other grounds, Tenn. Code Ann. § 39-13-204(c), as recognized in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004)) (analyzing hearsay under an abuse of discretion standard). But see State v. Gilley, 297 S.W.3d 739, 759-60 (Tenn. Crim. App. 2008)("The precedential history for utilizing the abuse of discretion standard for hearsay issues, however, is somewhat checkered; in some of the notable cases relied upon as precedent, the court did not apply the standard to the review of hearsay issues. . . . [I]n State v. Maclin, 183 S.W.3d 335 (Tenn. 2006), [our supreme court] adverted to the general rule of abuse of discretion review of evidentiary questions before commenting that '[h]owever, the
(continued...)

a defendant's confrontation rights is ... a pure question of law." <u>Franklin</u>, 308 S.W.3d at 809.[9]
Thus, the proper application of that law to the trial court's factual findings is a question of
law and is subject to de novo review. <u>Id.</u>

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one
made by the declarant while testifying at the trial or hearing, offered in evidence <u>to prove the
truth of the matter asserted</u>." (Emphasis added). Rule 802 provides that hearsay is not
admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid.
802.

*A. Hearsay: Admission of Victim's Father's Statements*

The Defendant contends that the following statements made by the victim's father,
James Clemens, during his testimony were inadmissible hearsay and should not have been
admitted:

1. [That Ms. Drew told Mr. Clemens that] "Someone had robbed [the
   victim],"

2. [Ms. Drew relayed that] "Our son has been beaten really badly and he
   is in serious, grave condition and we need to get to Vanderbilt Hospital
   in Nashville as fast as possible,"

3. The doctor told Mr. Clem[e]ns, "If this will help you out any, Mr.
   Clem[e]ns, we had turned the machine off on him two or three hours
   before to see if he could survive on his own, but he did not." "We just
   turned it back on so it wouldn't be an immediate disruption to you all."

The Defendant concedes that "the first two statements are probably admiss[i]ble even though
they are hearsay." However, the Defendant insists that "the allowance by the Court of the
witness to testify as to what a doctor told him was hearsay [and] could have been offered for
no other reason other than the truth of the matter asserted. The [third] statement was not

[8](...continued)
issue of whether the admission of hearsay statements violated a defendant's rights under the Confrontation
Clause is purely a question of law.' Additionally, panels of the intermediate appellate courts have applied
a de novo standard to the review of hearsay issues [and permission to appeal these decisions was denied].")

[9] Although the Defendant does not directly allege that his confrontation rights were violated, he does argue
that he was denied his right to cross-examine co-defendant Hooten regarding the hearsay statements that were
introduced and that necessarily implicates the Defendant's right to confront the witnesses against him.

offered, as the first two were, to predicate what actions were taken in response thereto" but solely to prejudice the Defendant. The State responds that "none of the statements were offered as assertions of fact" but "to show why Mr. Clem[e]ns did what he did."

This court has held that statements used to prove the effect on a listener are not hearsay:

> [A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

State v. Carlos Jones, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[7], at 8-23 (5th ed. 2005)); see generally State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim).

Here, the trial court determined that Mr. Clemens's statements were not hearsay because they were not offered to prove the truth of the matter asserted. We agree. As the State succinctly noted, the statements were offered to provide context for Mr. Clemens's actions: going to the hospital and, ultimately, removing the victim from life support. Nevertheless, even if the statements were admitted in error, the error would have been harmless because the admission of this evidence neither affected the judgment nor resulted in prejudice to the judicial process as evidence of the victim's death and its cause were later admitted into evidence. See Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008). Therefore, it was not error for the trial court to admit the statements at issue.

*B. Hearsay and Confrontation: Admission of Co-Defendant Hooten's Statements*

The Defendant contends that the trial court erred in admitting the following four statements that co-defendant Hooten made to police:

1. No sir. I'm done talking to you.

2. Well, I think I might want to talk to my lawyer.

3. Look, you might as well take me to jail so I can get breakfast. I ain't giving

you a  statement[.]

4.  If I answer your questions things are going to get ugly[.[10]]

The Defendant explains that these statements were improperly admitted into evidence (1) because they are hearsay and (2) because the Defendant did not have an opportunity to cross-examine co-defendant Hooten, violating the spirit of Bruton v. United States, 321 U.S. 193 (1968), despite the severance of the trials.  The State responds, first, that this issue has been waived because the Defendant failed to include appropriate citations to the record and did not "properly preserve this issue by raising it in his motion for new trial."  Alternatively, the State responds that the statements are not hearsay, thus properly admitted, because "none of the statements above are factual in nature nor do they state that some factual proposition is true"; further, the statements were not offered for the truth of the matter asserted.

As a preliminary matter, we address the State's argument that the Defendant has waived review of this issue because he did not raise it in his motion for a new trial nor did he include appropriate citations to the record.  It is true that the Defendant failed to include four of the five statements, which he now cites as inadmissible hearsay, in his motion for a new trial.  However, he did raise the general issue that the trial court erred in admitting one of the co-defendant's statements, "It will be ugly if I give a statement," arguing that it was improper because the declarant could not be cross-examined.  See Fahey v. Eldridge, 46 S.W.3d 138, 143 (Tenn. 2001)(stating that "when an appellate court reviews a motion for a new trial under [Tennessee] Rule [of Appellate Procedure] 3(e), it should view the motion in the light most favorable to the appellant, and it should resolve any doubt as to whether the issue and its grounds were specifically stated in favor of preserving the issue").  Therefore, we conclude that the Defendant's motion for a new trial sufficiently raised the issue, at least as to the statement cited in his motion for new trial as noted above, and preserved it for our review.  Further, despite the lack of citations to the record,[11] in the interests of justice, we will review this issue on the merits.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

---

[10] This statement is phrased differently in the Defendant's brief than it is in the record, "It will be ugly if I give a statement."  Nevertheless, we surmise that this is the statement to which the Defendant is referring.

[11] We note that although the Defendant failed to cite to the record, a violation of the Rules of the Court of Criminal Appeals, the record does reflect that the Defendant objected to the trial court's admission of co-defendant Hooten's statements, at one point even requesting a mistrial citing irreparable damage to the Defendant.  See generally Tenn. Ct. Crim. App. R. 10(b)("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

him." U.S. Const. amend. VI; see Tenn. Const. art. I, § 9. Both the clauses in the United States and Tennessee constitutions prohibit the admission of testimonial hearsay unless the witness "was unavailable to testify, and the defendant [] had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 54 (2004); see U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In Crawford, the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when (1) the declarant is unavailable, and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 68-69; see also State v. Maclin, 183 S.W.3d 335, 345 (Tenn. 2006), abrogated by State v. Cannon, 254 S.W.3d 287 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. Franklin, 308 S.W.3d at 810. Nonhearsay statements – i.e., statements not admitted for the truth of the matter asserted – do not violate the Confrontation Clause, whether or not the statements are testimonial. Id. Thus, we must first determine whether co-defendant Hooten's statements were hearsay.

In the instant case, the trial court found that co-defendant Hooten's statements were not offered for the truth of the matter asserted and, as such, were not hearsay. We agree that these statements are not hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Under Rule 801(a), "[a] 'statement' is (1) an oral or written assertion." Although an assertion made in words is undoubtedly intended by the declarant to be an assertion, not all verbal utterances are readily ascertainable as assertions, such as the case now before this court. See State v. Land, 34 S.W.3d 516, 525-26 (Tenn. Crim. App. 2000). An utterance must, in order to be an assertion, be offered with the intent to state that some factual proposition is true. State v. Brown, 373 S.W.3d 565, 572 (Tenn. Crim. App. 2011)(quoting Land, 34 S.W.3d at 526)). As the State succinctly argues, co-defendant Hooten's statements do not appear to be "factual in nature nor do they state that some factual proposition is true." In fact, the statements are highly ambiguous, and it is difficult to ascertain what the "truth" in the statement is that the declarant may be attempting to assert. Further, to the extent that one of the statements could potentially be construed by a different trier of fact as asserting a factual proposition or being offered for its truth, "I think I might want to talk to my lawyer," we note that the Defendant failed to cite this particular statement as error in his motion for a new trial. Because the trial court did not have the opportunity to rule on the issue, the Defendant has waived our review of the statement, and plain error review is neither requested nor warranted. See Tenn. R. App. P. 3(e)(stating that "no issue presented for review shall be predicated upon error ... unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). For the reasons cited above, we conclude that the statements at issue are not hearsay.

Turning to the issue of confrontation, our supreme court has held that "[t]he <u>Bruton</u> rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfess[ing] co-defendant's Sixth Amendment right of confrontation." <u>State v. Elliot</u>, 524 S.W.2d 473, 477 (Tenn. 1975). However, courts have widely held that the admission of nonhearsay is not a <u>Bruton</u> violation. <u>See</u> <u>United States v. Inadi</u>, 475 U.S. 387, 398 n.11 (1986)(stating that nonhearsay does not violate the defendant's right to confront witnesses); <u>Anderson v. United States</u>, 417 U.S. 211, 220 (1974) ("[S]ince the prosecution was not contending that anything [the non-testifying defendants] said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue."); <u>White v. Lewis</u>, 874 F.2d 599, 603 (9th Cir. 1989) ("Because this testimony was not used for the truth of the matter asserted by the out-of-court declarant, it was not hearsay, and <u>Bruton</u> is inapposite."); <u>Tennessee v. Street</u>, 471 U.S. 409, 414 (1985); <u>State v. Alexis Mason and Terrence Harris</u>, No. W2010-02321-CCA-R3-CD, 2013 WL 1229447, at * 11 (Tenn. Crim. App. Mar. 27, 2013); <u>see also</u> <u>State v. Derrick Sorrell</u>, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *5 (Tenn. Crim. App. Apr. 8, 2009) ("The audiotape contained a conversation between the defendant and a second person and cannot be barred by the Confrontation Clause because the conversation was not offered for truth, but instead for context and evidence of knowledge."); <u>Jones</u>, 598 S.W.2d at 223. Therefore, because as previously concluded, co-defendant Hooten's statements were not hearsay, they do not implicate the Defendant's right of confrontation under <u>Bruton</u> or <u>Crawford</u>, and their admission was not improper.

Nevertheless, even if the trial court's admission of co-defendant Hooten's statements was improper, such error was harmless given the overwhelming evidence of the Defendant's guilt. <u>See</u> <u>King v. State</u>, 989 S.W.2d 319, 329-30 (Tenn. 1999); <u>see also</u> Tenn. R. App. P. 36(b)("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Moreover, "'the line between harmless and prejudicial error is in direct proportion to the degree ... by which proof exceeds the standard required to convict....'" <u>Spicer v. State</u>, 12 S.W.3d 438, 447-48 (Tenn. 2000) (quoting <u>Delk v. State</u>, 590 S.W.2d 435, 442 (Tenn. 1979)). Here, the proof against the Defendant was sufficient to support his convictions, as discussed in more detail below, despite any harm that the admission of co-defendant Hooten's ambiguous statements might have caused. As such, the Defendant is not entitled to relief on this issue.

### IV. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial was insufficient to support

his convictions for first degree premeditated murder, first degree felony murder, and aggravated robbery. The State responds that the evidence is more than sufficient to sustain his convictions. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was found guilty of first degree felony murder, aggravated robbery, and premeditated first degree murder. We will address the sufficiency of each conviction below.

*A. Aggravated Robbery and First Degree Felony Murder*

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). An aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" or where "the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a). In this case, felony first

degree murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any ... robbery...." Tenn. Code Ann. § 39-13-202(a)(2).

In the instant case, the evidence showed that the Defendant and co-defendant Hooten conspired to rob the victim when they met in the restroom at the bar. The two men left the bar with the victim and went to get drugs, which were never recovered. Although the Defendant insisted that they never found any drugs and that this was the reason he and the victim got into an altercation, Mr. Morgan, who was incarcerated with the Defendant, testified that the Defendant told him that the men did in fact buy and use some of the drugs they had purchased. Mr. Morgan also testified that the victim contributed the bulk of the money used to buy the drugs and that the altercation occurred because of the distribution of those drugs: the Defendant and co-defendant Hooten were upset because the victim had more of the drugs than they received. The Defendant admitted that he and the victim got into an argument and said that they decided to get out of the car to fight at the Wayside Inn. The Defendant then struck the victim, and a fight commenced. At some point, the Defendant took the rest of the drugs. As the Defendant was leaving the scene, Mr. Reed testified that he found the victim in the parking lot behind the Wayside Inn, badly beaten and unresponsive. He called 911; however, the victim later died as a result of his injuries. Mr. Reed also said that he saw two men, one smaller and one larger, walking away from the victim, and they got into a maroon or red colored Cadillac. When the Defendant was stopped by officers and the car he was a passenger in was searched, officers found the Defendant's shoe, covered in the victim's blood, in the trunk. After his arrest, and upon further examination, the victim's blood was found on the Defendant's pants. Viewed in a light most favorable to the State, we conclude that the evidence presented was sufficient for a reasonable jury to find the Defendant guilty of first degree felony murder and aggravated robbery.

### B. Premeditated First Degree Murder

Tennessee Code Annotated section 39-13-202(a)(1) defines premeditated first degree murder as "[a] premeditated and intentional killing of another." A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

-19-

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewed in a light most favorable to the State, we conclude that the evidence presented was sufficient for a reasonable jury to find the Defendant guilty of premeditated first degree murder. The record reflects that the Defendant and the victim had an argument over drugs and got out of the car to fight. According to what the Defendant told Mr. Morgan about the incident, the Defendant then struck the victim and kicked him in the face multiple times. As the Defendant was walking away from the victim to return to the car, co-defendant Hooten told the Defendant to kick the victim in the face "because he was still moving[,]" and the Defendant did so. Mr. Morgan testified that the Defendant emphasized that he was mimicking an action from a scene of a video named "Faces of Death" where a man is kicked in the face multiple times. The Defendant then left the scene and rode around for approximately an hour before officers stopped them. Further, by his own omission, at no point did the Defendant attempt to render aid to or otherwise seek aid for the victim; the two men were relatively calm after the incident, going to visit co-defendant Hooten's uncle's house; and the Defendant hid his shoes with the victim's blood on them in the trunk of the car after the incident. Given this evidence, we conclude that it was reasonable for the jury to find that such actions evinced a premeditated intent to kill the victim.

CONCLUSION

Based on our review of the record and the applicable law, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE